# Illinois Official Reports

## Appellate Court

---

### *Rozsavolgyi v. City of Aurora*, 2016 IL App (2d) 150493

---

| | |
|---|---|
| Appellate Court Caption | PATRICIA ROZSAVOLGYI, Plaintiff-Appellee, v. THE CITY OF AURORA, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0493 |
| Filed<br>Rehearing denied | April 27, 2016<br>July 6, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 14-L-49; the Hon. Thomas E. Mueller, Judge, presiding. |
| Judgment | Certified questions answered; cause remanded. |
| Counsel on Appeal | Matthew D. Rose and John B. Murphey, both of Rosenthal, Murphey, Coblentz & Donahue, of Chicago, for appellant.<br><br>Glenn R. Gaffney and Jolianne S. Walters, both of Gaffney & Gaffney P.C., of Glendale Heights, for appellee.<br><br>Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Brett E. Legner, Assistant Attorney General, of counsel), *amicus curiae*. |

| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion. |
|---|---|
| | Justice Zenoff concurred in the judgment and opinion. |
| | Justice McLaren concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1    Plaintiff, Patricia Rozsavolgyi, has a medical history of unipolar depression, anxiety, panic attacks, and partial hearing loss. Her employer of 20 years, the City of Aurora (the City), terminated plaintiff's employment after she made a statement to a coworker in which she used the word "idiots." Plaintiff sued the City, alleging violations of the Illinois Human Rights Act (Human Rights Act) (775 ILCS 5/1-101 *et seq.* (West 2014)), including refusal to accommodate, disparate treatment, retaliation, and hostile work environment. Following several interlocutory trial court orders, the City petitioned for leave to appeal under Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010) (permissive interlocutory appeals), asking that we answer the following certified questions:

(1) Does section 2-102(A) of the Human Rights Act prohibit "disability harassment" as a civil rights violation? Alternatively, do counts I (refusal to accommodate) and IV (hostile work environment) of plaintiff's complaint state cognizable civil rights violations under that section?

(2) If section 2-102(A) permits a cause of action for disability harassment, does the provision in section 2-102(D) of the Human Rights Act "that an employer shall be held responsible for sexual harassment of the employer's employees by nonemployees or nonmanagerial and nonsupervisory employees only if the employer becomes aware of the conduct and fails to take reasonable corrective measures" (775 ILCS 5/2-102(D) (West 2014)) similarly apply to a cause of action for disability harassment brought under section 2-102(A)? If yes, does the employee or the employer bear the burden of alleging and proving that the employer: (a) is aware of the conduct by its nonmanagerial and nonsupervisory employees and (b) fails to take reasonable corrective measures? If no, can an employer assert the *Faragher-Ellerth*[1] affirmative defense to a hostile-work-environment harassment claim brought under section 2-102(A)?

(3) Does the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2014)) apply to a civil action under the Human Rights Act where the plaintiff seeks damages, reasonable attorney fees, and costs? If yes, should this court modify, reject, or overrule its

---

[1]With respect to claims brought pursuant to Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e *et seq.* (2012)), where the harassing employee is a supervisor, but the harassment does not result in tangible employment action, an employer may raise the *Faragher-Ellerth* affirmative defense that: (1) it exercised reasonable care to prevent and correct the harassment and (2) the employee unreasonably failed to take advantage of the preventive or corrective opportunities the employer provided. See *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

holdings, in *People ex rel. Birkett v. City of Chicago*, 325 Ill. App. 3d 196, 202 (2001), *Firestone v. Fritz*, 119 Ill. App. 3d 685, 689 (1983), and *Streeter v. County of Winnebago*, 44 Ill. App. 3d 392, 394-95 (1976), that "the Tort Immunity Act applies only to tort actions and does not bar actions for constitutional violations" (*Birkett*, 325 Ill. App. 3d at 202)?

¶ 2    We granted the petition, and, for the reasons set forth herein, we answer the certified questions as follows: (1) section 2-102(A) of the Human Rights Act prohibits hostile-work-environment disability harassment, and a reasonable-accommodation claim may be brought as a separate claim under that provision; (2) section 2-102(D) of the Human Rights Act applies to hostile-work-environment disability-harassment claims brought under section 2-102(A), and the employee always bears the ultimate burden of persuasion in such a case; and (3) the Tort Immunity Act applies to actions under the Human Rights Act; the City thus can assert immunity with respect to plaintiff's request for damages but not to her request for equitable relief, and we acknowledge that the supreme court has impliedly rejected our holdings that the Tort Immunity Act applies only to tort actions and does not apply to constitutional claims, and, thus, we do not follow that precedent.

¶ 3                                    I. BACKGROUND
¶ 4                                A. Plaintiff's Complaint
¶ 5    Plaintiff sued the City on January 22, 2014. She had worked for the City from 1992 to July 13, 2012, most recently as a property maintenance compliance officer (reporting to Dave Dykstra and Mark Anderson). Plaintiff alleged that she had a medical history of unipolar depression, anxiety, panic attacks, and partial hearing loss, which together constituted a "disability" under section 1-103(I) of the Human Rights Act (775 ILCS 5/1-103(I) (West 2014)). Her conditions did not prevent her from performing her job duties. However, when she was provoked, she was particularly likely to react strongly, though never in a physical manner. Plaintiff would speak loudly or in a fast-paced manner, especially when provoked or agitated.

¶ 6    Plaintiff further alleged that she notified the City of her medical conditions, asking it to take them into consideration in her requests and attempts to maintain a reasonable and professional work environment. The City "failed and refused to take any action." According to plaintiff, her coworkers engaged in an intentional pattern and practice to "agitate, embarrass, humiliate, degrade, harass, discriminate and provoke" her, creating a hostile and offensive work environment. This conduct included name-calling (*e.g.*, cuckoo, Shutter's Island, prostitute, bitch, ignorant, nuts, crazy, weird, whacko), notes, spitting on her car window, and creating false rumors. Plaintiff alleged that this was a purposeful effort to cause her emotional distress and agitate her. She also alleged that certain staff and coworkers falsely claimed that plaintiff was a physical threat even though she was not, and never had been, violent.

¶ 7    Plaintiff alleged that she repeatedly complained to the City (specifically, to Dykstra and Anderson) and her union representative, but they "failed and refused to take any action" to stop the behavior. As a result, plaintiff sustained further emotional harm and aggravation of her medical conditions. Also, the behavior impacted her ability to concentrate at work. She suffered from depression, including fatigue, sadness, helplessness, irritability, restlessness, anxiety, sleep disorders, and body aches.

¶ 8    The City asked the union president to guarantee that plaintiff would not engage in physical violence in the workplace and the union responded that plaintiff's counselors and doctors did not deem her to be a physical threat but that the union could never guarantee that anyone would never commit an act of physical violence in the workplace.

¶ 9    As of July 2012, a counselor had diagnosed plaintiff as being in the throes of depressive and panic disorders. On July 3, 2012, plaintiff made a statement to a coworker, using the word "idiots." The City then terminated her employment. Plaintiff alleged that other employees had used far worse words and had not been disciplined. She argued that, if the City had taken reasonable steps to prevent the harassment, she would not have been in a vulnerable position. Also, the City perceived plaintiff as being a risk or a threat to her coworkers and she was discriminated against based on this and her medical history.

¶ 10    Plaintiff's four-count complaint alleged: (1) refusal to accommodate; (2) disparate treatment; (3) retaliation; and (4) hostile work environment. She sought back pay, front pay, the value of lost benefits, compensatory damages, reinstatement with full seniority, attorney fees, and the costs of her suit.[2]

¶ 11    In answers to interrogatories, plaintiff responded that she never filed a harassment complaint pursuant to the City's antiharassment policy[3] or initiated with the City's human resources department a request for a reasonable accommodation under the City's reasonable-accommodations policy.[4] However, she stated that she made numerous oral complaints to the City about the harassment. In count I, she alleged that she reasonably communicated to the City that she was seeking an accommodation due to her medical conditions and that she made repeated requests to management to take action to stop the harassing and demeaning conduct. According to plaintiff, she and her union representative were told that plaintiff had to "live with it," "deal with it," and "ignore it." They were also told, "I don't think that's harassment" and "do what you gotta do."

¶ 12    B. The City's Answer and Affirmative Defenses

¶ 13    The City admitted that, prior to July 2012, it had received documentation that reflected that plaintiff had been diagnosed with unipolar depression, anxiety, panic attacks, and partial

---

[2] Plaintiff first filed her discrimination charge with the Department of Human Rights (Department). Because the Department did not complete its investigation of her case within 365 days from the date she filed her charge, it issued a notice authorizing plaintiff to file a civil action in the appropriate circuit court as of November 18, 2013. 775 ILCS 5/7A-102(G) (West 2014).

[3] The policy provides that: "If an employee feels that he/she has experienced or witnessed harassment, the employee is to immediately report the act of harassment to his/her Immediate Supervisor, Division Director, Department Head, Corporation Counsel or Director of Human Resources." The policy does not specify that the report must be in writing.

[4] That policy provides that, pursuant to the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 *et seq.* (2012)), an "employee with a known disability shall request an accommodation from his immediate supervisor. The immediate supervisor, in concert with the Department Head and the Reasonable Accommodation Committee, shall determine if the accommodation is reasonable and provide the accommodation as provided herein." The policy does not specify that the request be in writing.

hearing loss. However, it denied most of plaintiff's allegations, including that her medical conditions constituted a disability or that they caused her difficulty at work.

¶ 14 The City also raised several affirmative defenses: (1) lack of subject matter jurisdiction (all counts); (2) the existence of a policy prohibiting discrimination, harassment, and retaliation on the basis of disability (per its collective bargaining agreement with the union and its employee handbook) and plaintiff's failure to pursue corrective opportunities thereunder, to request an accommodation, or to report any harassment and the lack of any harassment by any supervisory or managerial employee and the City's lack of knowledge about any harassment by nonsupervisory, nonmanagerial coworkers (counts I and IV); (3) supervisory immunity under section 3-108 of the Tort Immunity Act (745 ILCS 10/3-108 (West 2014)) (counts I and IV); (4) discretionary immunity under section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201 (West 2014)) (counts I and IV); (5) plaintiff's injuries were caused by the adoption of, or failure to adopt, an enactment under section 2-103 of the Tort Immunity Act (745 ILCS 10/2-103 (West 2014)) (all counts); and (6) preemption by the Illinois Workers' Compensation Act (820 ILCS 305/5(a) (West 2014)) (counts I and IV). The City asked that the court strike and/or dismiss the counts in plaintiff's complaint.

¶ 15                                    C. Trial Court Orders

¶ 16 On October 17, 2014, the trial court struck and dismissed counts I and IV of plaintiff's complaint, finding that disability *harassment* (as opposed to disability *discrimination*) was not a civil rights violation under the Human Rights Act. On January 23, 2015, however, the court granted plaintiff's motion to reconsider, reinstated counts I and IV, and gave the City leave to file amended affirmative defenses. On April 22, 2015, the trial court denied plaintiff's motion to strike the City's first and second affirmative defenses (subject matter jurisdiction and existence of employer policy), but granted the motion to strike the third, fourth, fifth, and sixth affirmative defenses (raising the tort immunity and workers' compensation statutes).

¶ 17 On April 29, 2015, the court entered an order finding that its aforementioned interlocutory orders involved questions of law as to which there were substantial grounds for difference of opinion and that an immediate appeal from said orders may materially advance the ultimate termination of the litigation. Ill. S. Ct. R. 308 (eff. Jan. 1, 2015). It certified the questions noted above.

¶ 18 On June 23, 2015, we granted the City's petition for leave to appeal.[5]

¶ 19                                        II. ANALYSIS
¶ 20                                     A. Standard of Review
¶ 21 An interlocutory appeal pursuant to Rule 308 is ordinarily limited to the question certified by the trial court, which, because it must be a question of law, is reviewed *de novo*. *Thompson v. Gordon*, 221 Ill. 2d 414, 426 (2006). Similarly, we review *de novo* statutory construction issues (*Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 237 (1996)),

---

[5]Further, we subsequently granted the Department's motion for leave to file an *amicus curiae* brief in support of plaintiff.

and the question whether a pleading is substantially insufficient in law (*Powell v. American Service Insurance Co.*, 2014 IL App (1st) 123643, ¶ 13).

¶ 22                                    B. Principles of Statutory Construction

¶ 23        Our primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009). The plain language of a statute is the most reliable indication of legislative intent. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). "[W]hen the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation." *Id.* The statute should be read as a whole and construed "so that no term is rendered superfluous or meaningless." *In re Marriage of Kates*, 198 Ill. 2d 156, 163 (2001). We do not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the legislative intent. *Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 212 Ill. 2d 237, 251 (2004).

¶ 24        If the words used in a statute are ambiguous or if the meaning is unclear, a court may consider the legislative history as an aid to construction. *Armstrong v. Hedlund Corp.*, 316 Ill. App. 3d 1097, 1106 (2000). A statute is ambiguous if it is capable of two reasonable and conflicting interpretations. *Tri-State Coach Lines, Inc. v. Metropolitan Pier & Exposition Authority*, 315 Ill. App. 3d 179, 190 (2000). Our supreme court has instructed that, "[i]f the language of a statute is susceptible to two constructions, one of which will carry out its purpose and another which will defeat it, the statute will receive the former construction." *Harvel v. City of Johnston City*, 146 Ill. 2d 277, 284 (1992). A court should not construe a statute in a manner that would lead to consequences that are absurd, inconvenient, or unjust. *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 513-14 (1998). Further, a court should avoid an interpretation of a statute that would render any portion of it meaningless or void. *McNamee v. Federated Equipment & Supply Co.*, 181 Ill. 2d 415, 422 (1998).

¶ 25                                    C. Human Rights Act Framework

¶ 26        The Human Rights Act expressly implements the guarantees provided by article I, sections 17, 18, and 19, of the Illinois Constitution (Ill. Const. 1970, art. I, §§ 17, 18, 19). 775 ILCS 5/1-102(F) (West 2014). The statute provides a comprehensive scheme to "secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, order of protection status, marital status, *physical or mental disability*, military status, sexual orientation, pregnancy, or unfavorable discharge from military service *in connection with employment*, real estate transactions, access to financial credit, and the availability of public accommodations." (Emphases added.) 775 ILCS 5/1-102(A) (West 2014). The Human Rights Act is remedial legislation. *Arlington Park Race Track Corp. v. Human Rights Comm'n*, 199 Ill. App. 3d 698, 703 (1990). Accordingly, we liberally construe it to effectuate its purposes. *Id.*

¶ 27        Sections 2-102 and 6-101 of the Human Rights Act set forth what constitute civil rights violations in employment. Section 2-102(A) provides that it is a civil rights violation "[f]or any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge,

discipline, tenure or *terms, privileges or conditions of employment* on the basis of unlawful *discrimination* or citizenship status." (Emphases added.) 775 ILCS 5/2-102(A) (West 2014). Other subsections of section 2-102 prohibit: employers' restrictions on use of a language in communications unrelated to the employee's duties (775 ILCS 5/2-102(A-5) (West 2014)); employment agency discrimination (775 ILCS 5/2-102(B) (West 2014)); labor organization discrimination (775 ILCS 5/2-102(C) (West 2014)); sexual harassment by various entities/persons, including employers and employees (775 ILCS 5/2-102(D) (West 2014)); public employers' restrictions on employees' practice of their religious beliefs (775 ILCS 5/2-102(E) (West 2014)); age discrimination by employers or labor organizations with respect to selection for or conduct of apprenticeship or training programs (775 ILCS 5/2-102(F) (West 2014)); certain immigration-related practices (775 ILCS 5/2-102(G) (West 2014)); pregnancy discrimination and refusals of pregnancy-related requests for reasonable accommodations (775 ILCS 5/2-102(I), (J) (West 2014)); and the failure to post notices concerning employees' rights under the statute (775 ILCS 5/2-102(K) (West 2014)). The statute also prohibits retaliation against a person because he or she has opposed, *inter alia*, unlawful discrimination or sexual harassment, because he or she has filed a charge, or because he or she has requested a reasonable accommodation. 775 ILCS 5/6-101(A) (West 2014).

¶ 28        "Unlawful discrimination" is defined as "discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, *disability*, military status, sexual orientation, pregnancy, or unfavorable discharge from military service as those terms are defined in this Section." (Emphasis added.) 775 ILCS 5/1-103(Q) (West 2014). "Disability," in turn, is defined, in part, as "a determinable physical or mental characteristic of a person *** which may result from disease, injury, congenital condition of birth or functional disorder" and "is unrelated to the person's ability to perform the duties of a particular job or position." 775 ILCS 5/1-103(I)(1) (West 2014).

¶ 29        The term "harassment" explicitly appears in the Human Rights Act in the employment context only with respect to "sexual harassment," which is defined as "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance *or creating an intimidating, hostile or offensive working environment*." (Emphasis added.) 775 ILCS 5/2-101(E) (West 2014). Similarly, the term "hostile or offensive working environment" explicitly appears only in this context. The Human Rights Act explicitly prohibits sexual harassment. It provides that it is a civil rights violation "[f]or any employer, employee, agent of any employer, employment agency or labor organization to engage in sexual harassment; provided, that an employer shall be responsible for sexual harassment of the employer's employees by nonemployees or nonmanagerial and nonsupervisory employees only if the employer becomes aware of the conduct and fails to take reasonable corrective measures." 775 ILCS 5/2-102(D) (West 2014); see also *Sangamon County Sheriff's Department v. Human Rights Comm'n*, 233 Ill. 2d 125, 138-41 (2009) (employers are strictly liable for sexual harassment by supervisory employees, even where the

supervisory worker has no authority to affect the terms and conditions of the complaining employee's employment and regardless of whether the employer was aware of the harassment or took measures to correct it).

¶ 30                                    D. First Certified Question

¶ 31    The first certified question asks: "Does section 2-102(A) of the Human Rights Act prohibit 'disability harassment' as a civil rights violation? Alternatively, do counts I and IV of plaintiff's complaint state cognizable civil rights violations under that section?" For clarity and to more accurately reflect the parties' arguments, we address whether the following claims are cognizable under the statute: (1) hostile-work-environment disability harassment (count IV) and (2) refusal to provide reasonable accommodation (count I).

¶ 32                        (1) Hostile-Work-Environment Disability Harassment

¶ 33    In count IV, plaintiff alleged that the City violated her civil rights by failing to take actions to stop the harassment/hostile work environment based upon her disability. This claim relies on section 2-102(A).

¶ 34    As noted above, although the Human Rights Act explicitly references disability *discrimination* (in section 2-102(A)), it does not, with respect to employment, explicitly refer to disability *harassment*. Rather, it explicitly makes only *sexual* harassment a civil rights violation. 775 ILCS 5/2-102(D) (West 2014); see also 775 ILCS 5/5A-102 (West 2014) (prohibiting sexual harassment in education, but not referring to disability harassment in that context).[6] Also, in the statute's declaration of policy, the General Assembly explicitly recognized the public policies to secure freedom from unlawful discrimination (in section 1-102(A)) and, separately, freedom from sexual harassment in employment and education (in section 1-102(B)).[7]

¶ 35    The City contends that the Human Rights Act unambiguously reflects that discrimination and (only sexual) harassment are separate and distinct civil rights violations. It further asserts that, had the General Assembly intended to prohibit a hostile work environment based on disability (*i.e.*, disability harassment), it would have done so by making disability harassment a separate civil rights violation, just as it did for sexual harassment. (In 1983, the General Assembly amended the Human Rights Act to add a provision addressing "sexual harassment" under sections 2-102(D) (in employment) and 5A-102(A) (in education). Pub. Act 83-89, § 1 (eff. Jan. 1, 1984) (amending Ill. Rev. Stat. 1981, ch. 68, ¶ 2-102); Pub. Act 83-91, § 1 (eff. Jan. 1, 1984) (amending Ill. Rev. Stat. 1981, ch. 68, ¶ 5A-102).) Alternatively, the City

---

[6]However, by rule, the Department and the Human Rights Commission (Commission) have proscribed national-origin harassment. 56 Ill. Adm. Code 5220.900 (1986).

[7]In the same provision, the legislature also listed as public policies: freedom from employment discrimination based on citizenship status (775 ILCS 5/1-102(C) (West 2014)); freedom from discrimination based on familial status in real estate transactions (775 ILCS 5/1-102(D) (West 2014)); public health, welfare, and safety (775 ILCS 5/1-102(E) (West 2014)); implementation of the aforementioned constitutional guarantees (775 ILCS 5/1-102(F) (West 2014)); equal opportunity and affirmative action by the State (775 ILCS 5/1-102(G) (West 2014)); and freedom from unfounded charges of discrimination, sexual harassment in employment or education, and employment discrimination based on citizenship status (775 ILCS 5/1-102(H) (West 2014)).

contends that the General Assembly could have amended section 2-102(A) to expressly clarify that unlawful discrimination includes harassment/hostile work environment, but it did not do so.

¶ 36   Pointing to foreign authority, the City contends that there is a well-recognized distinction between discrimination and harassment. See *Roby v. McKesson Corp.*, 219 P.3d 749, 762 (Cal. 2009) (noting the distinction in California's civil rights statute; discrimination involves explicit changes in the terms, conditions, or privileges of employment–changes involving official action taken by the employer; harassment, in contrast, focuses on situations where the workplace's social environment becomes intolerable because the harassment communicates an offensive message to the harassed employee).

¶ 37   Plaintiff and the Department respond that a disability harassment claim is legally cognizable as a civil rights violation under the "terms, privileges or conditions of employment" prong of section 2-102(A) of the Human Rights Act. In support, they point to: (1) case law that recognized harassment/hostile work environment claims before the enactment of section 2-102(D); (2) Commission interpretations; and (3) longstanding case law addressing *racial* harassment claims (which they note would not constitute viable civil rights violations if the City's argument were correct).

¶ 38   We turn first to the cases upon which plaintiff and the Department rely. In *Old Ben Coal Co. v. Human Rights Comm'n*, 150 Ill. App. 3d 304, 309 (1987), the Fifth District held that, even before the 1983 amendment that added section 2-102(D) to the Human Rights Act, the statute prohibited sexual harassment *as a form of sex discrimination*. It noted that, although a statutory amendment creates a presumption that the legislature intended to *change* the law, the presumption may be rebutted by demonstrating that the amendment reflects the legislature's intent to *clarify* the law as it previously existed. *Id.* at 306. After concluding that the statute was subject to differing interpretations, the court determined that the presumption was rebutted because: (1) the legislative history reflected that both proponents and opponents of the amendment considered sexual harassment to be a form of sex discrimination and that an amendment was necessary to *clarify* the prohibition; (2) federal decisions interpreting Title VII, although considering a statute that did not contain a separate amendment specifically addressing sexual harassment, did "not dissuade" the court from finding support therein in the cases' rationale that "terms, conditions, or privileges of employment" is an expansive concept that includes sexual harassment; (3) the Commission's interpretation of the statute, under which it considered sexual harassment allegations prior to the amendment, should be accorded significance; and (4) the interpretation of sexual harassment as a form of sex discrimination with respect to the "terms, privileges or conditions of employment" (775 ILCS 5/2-102(A) (West 2014)) was consistent with the Human Rights Act's purpose to secure freedom from sex discrimination in connection with employment. *Old Ben Coal*, 150 Ill. App. 3d at 308-09; see also *Board of Directors, Green Hills Country Club v. Human Rights Comm'n*, 162 Ill. App. 3d 216, 221 (1987) (Fifth District, relying on *Old Ben Coal*, further held that, prior to effective date of section 2-102(D), employers were strictly liable for sexual harassment by supervisory personnel regardless of whether they knew of such conduct).

¶ 39   Similarly, in *Village of Bellwood Board of Fire & Police Commissioners v. Human Rights Comm'n*, 184 Ill. App. 3d 339, 351 (1989), the First District upheld the Commission's determination that a racially charged atmosphere in a police department "amounted to racial

harassment, and thus, constituted discrimination based on race within the meaning of the [Human Rights Act]." (Racial harassment, like disability harassment, is not explicitly addressed in the statute.) Noting that the former employee had been continuously subjected to racially derogatory comments and that his supervisors were aware of the problem but did nothing to correct it, the court noted that "this is exactly the type of racial harassment which the [Human Rights Act] seeks to prevent." *Id.* at 350-51 (further noting that racial harassment involves more than a few isolated incidents of harassment; it must be severe and pervasive[8]); see also *ISS International Service System, Inc. v. Human Rights Comm'n*, 272 Ill. App. 3d 969, 975 (1995) (assessing national origin harassment allegations as discrimination claim under section 2-102(A)); *Hautpave*, Ill. Hum. Rts. Comm'n Rep. 1980SF0097 (Jan. 6, 1984) (assessing racial discrimination in the form of racial harassment); *Korshak*, Ill. Hum. Rts. Comm'n Rep. 1980CF1267 (June 11, 1982) (religious harassment constitutes discrimination on basis of religion).

¶ 40    In response, the City contends that *Old Ben Coal* was overruled *sub silentio* by two subsequent supreme court decisions: *Board of Trustees of Southern Illinois University v. Department of Human Rights*, 159 Ill. 2d 206, 213 (1994) (assessing whether an academic program at a public institution of higher learning constitutes a public place of accommodation such that Commission had jurisdiction to hear discrimination complaint, and holding that it did not; court noted that its conclusion was bolstered by the 1983 enactment of section 5A-102, which conferred on the Department jurisdiction over sexual harassment in higher education; addition of article 5A reflected the legislature's understanding that, until its passage, Department had no jurisdiction over institutions of higher education; thus, since 1983, Department had jurisdiction over higher education, but only as to a "very distinct" type of claim: sexual harassment), and *Sangamon County*, 233 Ill. 2d at 138-41 (based on its finding that statute was unambiguous and consideration of the public policy reasons supporting employer liability, holding that an employer is strictly liable under section 2-102(D) for hostile-environment sexual harassment by its supervisory employee, even where that employee has no authority to affect the terms and conditions of the complaining employee's employment and regardless of whether the employer was aware of the harassment or took measures to correct it; rejecting suggestion to look to federal case law, which uses a narrow definition of a supervisor). However, we find these cases inapposite. *Board of Trustees* addressed the Department's jurisdiction to hear racial discrimination claims against a public university and whether a public university was subject to the statute.

---

[8]Likewise, to create a hostile work environment, the misconduct "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive work environment.' " *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). The work environment "must be hostile or abusive to a reasonable person and the individual alleging sexual harassment must have actually perceived the environment to be hostile or abusive." *Trayling v. Board of Fire & Police Commissioners*, 273 Ill. App. 3d 1, 12 (1995) (sexual harassment case). A court examines all of the circumstances in determining whether an environment is hostile or abusive, including factors such as the " 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 55 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

The court, in *dicta*, stated that its conclusion that academic programs were not "accommodations" under the statute was "bolstered" by the 1983 amendment that specifically conferred on the Department jurisdiction over claims of sexual harassment in higher education, but the court did not address whether sexual harassment was a civil rights violation before the amendment. *Board of Trustees*, 159 Ill. 2d at 213. As the Department notes, the question in *Board of Trustees* was *who* was subject to the Human Rights Act, not *what* was prohibited by it. Further, the question whether racial harassment claims were cognizable under the statute was not before the court. Similarly, *Sangamon County* provides no guidance here because it did not address the issue in this case; it involved discrimination by a supervisory employee, which is not at issue here. *Sangamon County*, 233 Ill. 2d at 138-41.

¶ 41     The City contends that, unlike Title VII, which does not expressly distinguish between harassment and discrimination, the General Assembly's 1983 amendment reflects its intent to create a separate and distinct cause of action only for sexual harassment and to expand the scope of an employer's liability for a supervisor's harassment by imposing strict liability for any supervisory sexual harassment, without regard to whether it culminates in tangible employment action or the supervisor has authority over the victim's terms, privileges, or conditions of employment. The City also urges that the decision to expand beyond sexual harassment the Human Rights Act's protection against harassment in the workplace rests with the legislative branch, not the judicial branch.

¶ 42     We reject the City's arguments. We find the statute ambiguous. The ambiguity stems from the statute's prohibition in section 2-102(A) of unlawful discrimination with respect to the terms, privileges, or conditions of employment, which can reasonably be read to include harassment on the basis of an enumerated characteristic. Indeed, in *Old Ben Coal*, the Fifth District held as much with respect to sexual harassment prior to the legislature's enactment of section 2-102(D). *Old Ben Coal*, 150 Ill. App. 3d at 309. Also, the statute does not explicitly state that sexual harassment is the only type of harassment that constitutes a civil rights violation. However, another reading of the Human Rights Act is that the enactment of section 2-102(D) effectuated a change of existing law to add sexual harassment as an additional civil rights violation, to the (implicit) exclusion of other types of harassment.

¶ 43     Having determined that the statute is ambiguous, we turn to statutory-construction aids. In our view, they support an expansive reading of section 2-102(A), such as the approach taken in *Old Ben Coal*, and lead to the conclusion that disability harassment is a cognizable civil rights violation under section 2-102(A).

¶ 44     First, we consider the Human Rights Act's purposes. One of them is to "secure for all individuals *** the freedom from discrimination against any individual because of his or her *** physical or mental disability *** in connection with employment." 775 ILCS 5/1-102(A) (West 2014). It also implements several constitutional guarantees, including section 19 of article I, which provides: "All persons with a physical or mental handicap *** shall be free from discrimination unrelated to ability in the hiring and promotion practices of an employer" (Ill. Const. 1970, art. I, § 19). 775 ILCS 5/2-102(F) (West 2014). Reading section 2-102(A) to prohibit disability harassment undoubtedly comports with these purposes.

¶ 45     Turning to a second statutory-construction aid, the type of legislation, we note that the Human Rights Act constitutes remedial legislation, which is liberally construed to effectuate its purposes. *Arlington Park Race Track*, 199 Ill. App. 3d at 703. Broadly construing the

phrase "terms, privileges or conditions of employment" in section 2-102(A) to prohibit a hostile work environment based on disability is clearly consistent with the statute's purpose to effectuate the right of every disabled person to be free from workplace discrimination. We find additional support for this conclusion in the fact that the Commission, which, jointly with the Department, is the agency charged with enforcing the Human Rights Act (*Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 261 (1996)), has defined harassment "as any form of behavior which makes a working environment so hostile and abusive that it constitutes a different term and condition of employment based on a discriminatory factor." *Hines*, Ill. Hum. Rts. Comm'n Rep. 1988CN0644, at *3 (May 28, 1996) (finding that the employee established verbal harassment on the basis of race). The Commission has also noted in its decisions that, though there is no case law on the issue of disability harassment, "there is no logical reason why the [Human Rights] Act should tolerate workplace harassment based on a handicap when it does not tolerate harassment based on any other protected classification. [Citation.] Therefore, Complainant's handicap harassment claims should be analyzed in the same manner as the racial and gender harassment claims." *Gonzalez*, Ill. Hum. Rts. Comm'n Rep. 2006CF2012, at *8 (Aug. 23, 2010); see also 56 Ill. Adm. Code 5220.900 (1986) (proscribing national origin harassment). We place significant weight on these interpretations. See *Wanless v. Human Rights Comm'n*, 296 Ill. App. 3d 401, 403 (1998) (Commission's interpretation of the Human Rights Act is "accorded substantial weight and deference" by reviewing courts because its interpretation "flows directly from its expertise and experience with the statute that it administers and enforces").

¶ 46       Furthermore, we note that federal law, which we routinely consult and rely upon in this area (see *Valley Mould & Iron Co. v. Illinois Human Rights Comm'n*, 133 Ill. App. 3d 273, 279 (1985)), has been interpreted in a similar fashion. In *Meritor Savings Bank*, 477 U.S. at 66, the Supreme Court held that the creation of a hostile work environment through *harassment* is a form of proscribed *discrimination* under Title VII. The Court determined that the phrase "terms, conditions, or privileges of employment," which appears in both Title VII and the Human Rights Act, reflects a legislative intent to encompass the full spectrum of discriminatory treatment in employment. *Id.* at 64. It also noted that EEOC guidelines, which it found instructive, defined sexual harassment as a form of sex discrimination. *Id.* at 65. The Court further noted that the guidelines had drawn on case law that held that Title VII hostile-work-environment claims could be brought in the contexts of race, religion, and national origin; thus, reading the statute to proscribe a hostile environment based on discriminatory sexual harassment was consistent with the case law. *Id.* at 66.[9]

_____

[9]Title VII does not address disability; however, the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 *et seq.* (2012)) does by prohibiting certain employers from discriminating against individuals on the basis of their disabilities. 42 U.S.C. § 12112(a) (2012). That statute also contains the phrase "terms, conditions, and privileges of employment" (42 U.S.C. § 12112(a) (2012)). Several federal circuit courts of appeals expressly recognize hostile-work-environment claims for disability harassment. *Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1155 (10th Cir. 2004); *Shaver v. Independent Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003); *Flowers v. Southern Regional Physician Services Inc.*, 247 F.3d 229, 233 (5th Cir. 2001); *Fox v. General Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001). Several other federal reviewing courts have assumed that such a cause of action is authorized by the ADA, without deciding the issue. See, *e.g.*, *Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*, 434 F.3d 75, 89 (1st Cir. 2006); *Silk v. City of Chicago*, 194 F.3d 788, 803-04 (7th

¶ 47    We reject the City's argument that Title VII case law is unhelpful because that statute does not explicitly and separately address sexual harassment, as the Human Rights Act does. This argument is unavailing because the Title VII case law interprets the phrase "terms, privileges or conditions of employment," which, again, is also contained in section 2-102(A) of the Human Rights Act.

¶ 48    The third statutory-construction aid we turn to is legislative history. The legislative history of section 2-102(D) reflects that the provision was added to the statute to *clarify* existing practices *and* to *narrowly expand* the available protections (the latter with respect to same-sex harassment and male victims, which are not alleged here). It clearly did not effect a change in the law by creating a new cause of action. See *Old Ben Coal*, 150 Ill. App. 3d at 307 (coming to the same conclusion: "both proponents and opponents of the amendment considered sexual harassment to be prohibited by the *** Human Rights Act as a form of sex discrimination and that the amendment was needed only to *clarify* this proscription" (emphasis added)). During the House debates, the sponsor, Representative Currie, responded as follows to the question whether sexual *harassment* cases had "currently" been considered sex *discrimination* cases by the Department and the Commission:

> "Presently, the [Department] understands that it may interpret its authority to deal with sex discrimination to include instances of sex harassment. The [Department] supports this Bill, as does the Commission, on the grounds that there is some ambiguity in that decision. It's based on council's opinion. Councils can change. Only through that opinion is the Department able to establish rules and regulations. *It would become much clearer if we were to establish this program in the state statutes themselves*. In addition, same sex harassment or harassment when the victim is a male can clearly not be covered under an interpretation of sex discrimination prohibition which the Department presently uses for these cases." (Emphasis added.) 83d Ill. Gen. Assem., House Proceedings, Mar. 23, 1983, at 55 (statements of Representative Currie).

Later in the proceedings, she stated that the Department took the position that passage of the amendment would "*clarify* and specify its authority." (Emphasis added.) *Id.* at 56. Furthermore, Representative Mays, an opponent, related a conversation with a Department representative who was asked if a case had ever come before the Commission that the Department refused to handle; Mays related that the Department responded to that in the negative but that the Department surmised that, as to an employer who harassed both male and female employees, a claim could not be brought as discrimination. *Id.* at 56-57. These excerpts reflect that the enactment of section 2-102(D) was a clarification of the law with respect to the issue before us.

¶ 49    The City points to the legislative history of article 5A of the Human Rights Act, which addresses elementary, secondary, and higher education. During the House debates on section 5A-102, which prohibits sexual harassment in education, Representative Koehler stated:

> "[This amendment] amends the Illinois Human Rights Act to include sexual harassment in higher education as a civil rights violation. Under the Human Rights Act, discrimination on the basis of sex already constitutes a civil rights violation.

Cir. 1999); *Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 666-67 (3d Cir. 1999).

- 13 -

However, it is important to point out that there is a distinct difference between sex discrimination, which deals with prejudice[,] and sexual harassment, which deals with a hostile environment and repeated torment." 83d Ill. Gen. Assem., House Proceedings, May 5, 1983, at 33-34 (statements of Representative Koehler).

Although the statement appears to somewhat conflict with the legislative history of section 2-102(D), we do not place much weight on it, because it addresses a different section of the statute than the one at issue here and does not specifically address whether harassment claims were already being heard under article 5A, as sexual-harassment employment claims were.

¶ 50    In summary, we conclude that the presumption that the 1983 amendment changed the law has been rebutted. We further hold that section 2-102(A) prohibits disability harassment. Accordingly, we answer the first part of the first certified question in the affirmative.

¶ 51                               (2) Reasonable Accommodation

¶ 52    In count I, plaintiff alleged that the City violated her civil rights by failing to provide a reasonable accommodation for her disability after she asked it to take appropriate action to stop her nonsupervisory coworkers' harassment. This part of the first certified question asks if such a claim is cognizable under section 2-102(A) of the Human Rights Act. The City argues that: (1) the Human Rights Act does not expressly impose such a duty on employers and should not be read to do so; and (2) a failure to provide a reasonable accommodation should be part of a *prima facie* case for unlawful disability discrimination, not a separate and distinct civil rights violation. For the following reasons, we conclude that a reasonable-accommodation claim is cognizable as a separate claim under section 2-102(A).

¶ 53    Preliminarily, we note again that the Human Rights Act is a remedial statute that is liberally construed to effectuate its purposes. *Arlington Park Race Track*, 199 Ill. App. 3d at 703. Also, "[a]n agency may adopt a rule and regulate an activity only insomuch as a statute empowers the agency to do so. [Citation.] An administrative rule unauthorized by statute is invalid, and we must strike it down." *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 656 (2005); see 775 ILCS 5/8-102(E) (West 2014). Where the legislature has charged an agency with administering and enforcing a statute, we " ' 'give substantial weight and deference' " to its resolution of any ambiguities in the statute. *Illinois Bell Telephone Co.*, 362 Ill. App. 3d at 656 (quoting *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)). This is so because the agency's interpretation "flows directly from its expertise and experience with the statute that it administers and enforces." *Wanless*, 296 Ill. App. 3d at 403. Where a statute is ambiguous, "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, *** the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). "A court will not substitute its own construction of a statutory provision for a reasonable interpretation adopted by the agency charged with the statute's administration." *Church v. State*, 164 Ill. 2d 153, 162 (1995).

¶ 54                    (i) Duty to Provide a Reasonable Accommodation

¶ 55        The duty to reasonably accommodate disabled employees is explicitly imposed only by administrative regulation. By joint rule, the Commission and the Department require that employers provide reasonable accommodations for "known physical or mental limitations of otherwise qualified disabled applicants or employees," unless the accommodations are prohibitively expensive or would unduly disrupt ordinary business conduct. 56 Ill. Adm. Code 2500.40(a) (2009). The employee seeking an accommodation has the burden to apprise the employer of his or her condition and submit any necessary medical documentation. 56 Ill. Adm. Code 2500.40(c) (2009); see also *Truger v. Department of Human Rights*, 293 Ill. App. 3d 851, 861 (1997) ("employee has the burden of asserting the duty and showing the accommodation was requested and necessary for adequate job performance"). "Once an employee requests an accommodation, it becomes the burden of the employer to show that there is no possible reasonable accommodation or that the employee would be unable to perform the job even with the accommodation." *Department of Corrections v. Human Rights Comm'n*, 298 Ill. App. 3d 536, 542 (1998). An accommodation may include: "alteration of the facility or work site; modification of work schedules or leave policy; acquisition of equipment; job restructuring; provision of readers or interpreters; and other similar actions." 56 Ill. Adm. Code 2500.40(a) (2009). The duty to accommodate does not require an employer to reassign or transfer an employee whose disability precludes him or her from performing the employee's present position. *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 392 (1994).

¶ 56        The *statute* itself expressly imposes a duty to reasonably accommodate only with respect to: (1) "an employee's or prospective employee's *religious* observance or practice without undue hardship on the conduct of the employer's business" (emphasis added) (775 ILCS 5/2-101(F) (West 2014)); (2) employees or applicants who are affected by a condition related to *pregnancy* or childbirth (775 ILCS 5/2-102(I) (West 2014)); and (3) in the context of *real estate transactions*, buyers' or renters' disabilities (775 ILCS 5/3-102.1(C) (West 2014)).

¶ 57        In adding section 2-102(I) of the Human Rights Act to address *pregnancy*-related accommodations, the General Assembly expressly found: "Employers are familiar with the reasonable accommodations framework. *Indeed, employers are required to reasonably accommodate people with disabilities*. Sadly, many employers refuse to provide reasonable accommodations or decline to extend workplace injury policies to pregnant women." (Emphasis added.) Pub. Act 98-1050, § 5(4) (eff. Jan. 1, 2015).

¶ 58        The City argues that plaintiff cannot state a cognizable civil rights violation in her reasonable-accommodation count, because the Human Rights Act unambiguously does not *expressly* impose on employers a duty to provide reasonable accommodations to disabled employees. If there is no statutory basis for the alleged duty, the regulations cannot create such a duty; rather, the better approach, the City urges (and as discussed in the next section), is to treat a failure to provide a reasonable accommodation as an element of the *prima facie* case for plaintiff's claim in count II, for disability discrimination based on disparate treatment. Under the City's reading, if the General Assembly had intended to make an employer's failure to reasonably accommodate a disability an independent civil rights violation, then it would have enacted a statutory amendment expressly stating so, just as it

- 15 -

did with respect to pregnant employees and real estate transactions. By example, the City notes that the General Assembly specifically amended the Human Rights Act to add sections 2-102(J) and 3-102.1(C), despite the existence of statutory provisions that already made it a civil rights violation to discriminate in the "terms, privileges or conditions of employment" on the basis of pregnancy or to commit unlawful discrimination in the "terms, conditions or privileges of a real estate transaction." See Pub. Act 98-1050 (eff. Jan. 1, 2015) (adding 775 ILCS 5/2-102(j)); Pub. Act 86-910 (eff. Sept. 1, 1989) (adding 775 ILCS 5/3-102.1). Citing case law that stands for the proposition that a statutory amendment creates a presumption that the legislature intended to change the law (*People v. Hicks*, 119 Ill. 2d 29, 34 (1987)), the City argues that these amendments reflect the General Assembly's determination that a failure to provide a reasonable accommodation is a distinct species of civil rights violation that must be specifically enumerated in order to be proscribed. It also suggests that its reading is logical because a reasonable-accommodation obligation essentially changes the "terms, privileges or conditions of employment" by imposing on an employer an affirmative duty to treat different employees differently due to their unique needs. Employers have no notice, the City asserts, that the Human Rights Act obligates them to develop reasonable-accommodation practices for employees' disabilities. It also notes that the Human Rights Act's definition of religion expressly states that an employer must provide a reasonable accommodation. 775 ILCS 5/2-101(F) (West 2014). Finally, the City notes that the Human Rights Act's definition of unlawful discrimination does not require a reasonable accommodation, in contrast to the ADA, which does so in a comparable definition. See 42 U.S.C. § 12112(a), (b)(5)(A) (2012) (defining "discriminate against a qualified individual on the basis of disability" to include the failure to provide reasonable accommodation).

¶ 59    No case has squarely addressed this issue, but case law has assumed that employers have a duty to reasonably accommodate a disability. See, *e.g.*, *Truger*, 293 Ill. App. 3d at 861 (referring to "an employer's duty to accommodate" a disability, without deciding whether duty is statutorily imposed); *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 392 (1994) (same and further holding that such duty extends only to accommodating a disabled employee in his or her present position); *Illinois Bell Telephone Co. v. Human Rights Comm'n*, 190 Ill. App. 3d 1036, 1050 (1989) (referring to duty to accommodate, without deciding whether duty is statutorily imposed). In addition, there is case law specifically citing or applying the regulations, which were initially promulgated in 1982. 6 Ill. Reg. 11489 (eff. Sept. 15, 1982); see, *e.g.*, *Brewer v. Board of Trustees of the University of Illinois*, 339 Ill. App. 3d 1074, 1080 (2003) (further noting that disability discrimination includes failure to reasonably accommodate), *abrogated on other grounds by Blount v. Stroud*, 232 Ill. 2d 302 (2009); *Department of Corrections*, 298 Ill. App. 3d at 541-43 (noting that, once the employee requests accommodation, it becomes the employer's burden to show that there is no possible reasonable accommodation or that the employee would be unable to perform job even with accommodation; holding that failure to provide reasonable accommodation violated the statute); *Whipple v. Department of Rehabilitation Services*, 269 Ill. App. 3d 554, 559 (1995) (citing regulations for proposition that an employer can rebut a discrimination charge by showing that the claimant was unqualified even with accommodation).

¶ 60    We find the statute ambiguous, defer to the Commission, and hold that the regulations are a valid exercise of its power to interpret the Human Rights Act and, further, that a reasonable accommodation claim may be brought as a separate claim under section 2-102(A). We find

unconvincing the City's argument that the General Assembly's amendment of the Human Rights Act to add the pregnancy-accommodation provision and its failure to similarly add a disability-accommodation provision reflects that no such duty exists with respect to disability. Although the duty exists only via regulation, we note that the regulations have been in effect for over 30 years without specific action by the General Assembly. Thus, for over three decades, employers have been on notice of their obligations with respect to disabled employees. We find additional support for our conclusion in the fact that, in enacting the pregnancy-accommodation provision, the General Assembly expressly found: "Employers are familiar with the reasonable accommodations framework. *Indeed, employers are required to reasonably accommodate people with disabilities*." (Emphasis added.) Pub. Act 98-1050, § 5(4) (eff. Jan. 1, 2015). The General Assembly's acknowledgement, in the legislative findings, of a reasonable-accommodation duty and its enactment of pregnancy-related protections reflect, in our view, its approval of the Commission's reasonable-accommodation regulations.

¶ 61   We also reject the City's argument that the fact that the Human Rights Act's definition of "religion" contains a reasonable-accommodation requirement but the disability provisions do not evince the legislature's determination that no accommodation duty exists with respect to disabled employees. The City elsewhere contends that the only civil rights violations are those expressly stated in section 1-103(D), which defines "civil rights violation" to include only those set forth in specific sections of the statute. 775 ILCS 5/1-103(D) (West 2014) (specifying, *inter alia*, sections 2-102, 2-103, 2-105, and 3-102.1). The definition of "religion" is contained in section 2-101, a provision that is *not* included in the definition of "civil rights violation." Thus, the City's argument, that a "civil rights violation" must be expressly noted in section 1-103(D), fails.

¶ 62   Finally, we similarly reject the City's argument that a reasonable-accommodation obligation changes the "terms, privileges or conditions of employment." This position is illogical. Taking reasonable steps to place a disabled person in a position to perform his or her job *without* discrimination does not change the terms, privileges, or conditions of that person's employment *on the basis of* discrimination. See 775 ILCS 5/2-102(A) (West 2014) (prohibiting actions with respect to the conditions of employment on the basis of unlawful discrimination).

¶ 63                          (ii) *Prima Facie* Case

¶ 64   The City next contends that a failure to provide a reasonable accommodation should be part of a *prima facie* case for unlawful discrimination (pointing again to count II of plaintiff's complaint, where she alleges disparate treatment), not a separate, distinct, or independent civil rights violation. It contends that, by pleading refusal to accommodate (count I), disparate treatment (count II), and hostile work environment (count IV), plaintiff is seeking a triple recovery for the same alleged discriminatory acts.[10] Plaintiff's position is that a failure to provide a reasonable accommodation is a *separate* disability discrimination theory. For the following reasons, we conclude that a reasonable-accommodation claim is a distinct action that may be separately/alternatively pleaded.

_____

[10]Count III is a retaliation claim, which is not relevant to this certified question.

¶ 65        Counts I, II, and IV each allege adverse employment consequences, and each is based on a different theory. In count I, the refusal-to-accommodate claim, plaintiff alleged that: she was qualified to perform and adequately performed her job; her medical conditions (unipolar depression, anxiety, panic attacks, and partial hearing loss) constituted a disability under the statute; plaintiff communicated to the City that she sought a reasonable accommodation for her disability; the City had a duty to engage in the interactive process; the City dismissed plaintiff's request; and the City denied her request without making an individualized assessment, and, as a result, she sustained damages. In count II, the disparate-treatment claim, plaintiff alleged that: her medical conditions constituted a disability under the statute; she was qualified for and adequately performed her job; the City terminated her employment because she was disabled; other individuals who did not have such a disability were assigned her duties; other employees were not terminated for behavior similar to or worse than that for which plaintiff was terminated; plaintiff's disability was a substantial and motivating factor in the City's decision to terminate plaintiff; the City would not have terminated her absent consideration of her disability; and the termination constituted intentional disability discrimination in violation of the statute. In count IV, the hostile-work-environment claim, plaintiff alleged that: her medical conditions constituted a disability under the statute; the work environment created by her coworkers substantially interfered with her work performance and created an intimidating, hostile, and offensive work environment; the City was aware of the environment but failed to take action to make the conduct cease and desist; the environment aggravated her medical conditions, and, as a result, plaintiff sustained damages.

¶ 66        In analyzing employment discrimination actions under the Act, courts use the analytical framework contained in decisions addressing Title VII and other federal statutes. *Zaderaka v. Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989). Within this framework, a plaintiff can prove discrimination in one of two ways: (1) through direct evidence or (2) through the indirect method of proof. *Lalvani v. Human Rights Comm'n*, 324 Ill. App. 3d 774, 790 (2001).

¶ 67        In the indirect method, the plaintiff uses the framework for Title VII claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283 (7th Cir. 1996) (*McDonnell Douglas* method is used to *indirectly* establish discrimination). First, the plaintiff must establish a *prima facie* case of discrimination, which will give rise to a rebuttable presumption that the employer unlawfully discriminated. Next, to rebut the presumption, the employer must articulate a legitimate and nondiscriminatory reason for its action. If the employer meets its burden of production, the presumption of unlawful discrimination falls. Then, the plaintiff must prove by a preponderance of the evidence that the employer's reason was simply a pretext for unlawful discrimination. *Peck v. Department of Human Rights*, 234 Ill. App. 3d 334, 336-37 (1992). "The *indirect* method is a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence–evidence that similarly situated employees not in the plaintiff's protected class were treated better–would permit a jury to infer discriminatory intent." (Emphasis added.) *Smith v. Chicago Transit Authority*, 806 F.3d 900, 905 (7th Cir. 2015).

¶ 68        In contrast, the *direct* method refers to "anything *other than* the *McDonnell Douglas* indirect approach." (Emphasis in original.) *Id.* at 904. To *directly* prove discrimination, the

employee may present direct evidence of an employer's discriminatory intent or relevant circumstantial evidence (*e.g.*, suspicious timing, ambiguous statements, treatment of other employees in the protected class) pointing to a discriminatory reason for the employer's action. *Id.* at 905. Once the employee directly establishes that in making its decision the employer substantially relied on a prohibited factor, the burden of proof, not merely of production, shifts to the employer to show that it would have made the same decision even if the prohibited factor had not been considered. *Lalvani*, 324 Ill. App. 3d at 790. The *indirect* method is relevant here.

¶ 69    Returning to the indirect method, to establish a *prima facie* case of disability discrimination, as set forth in *McDonnell Douglas*, a plaintiff must demonstrate that: (1) he or she is disabled as defined in the Act; (2) his or her disability is unrelated to the plaintiff's ability to perform the functions of the job he or she was hired to perform; and (3) an adverse job action was taken against the plaintiff because of the disability. *Department of Corrections v. Human Rights Comm'n*, 298 Ill. App. 3d 536, 540 (1998). However, to prove a failure to accommodate a disability, a plaintiff must show that: (1) he or she is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. See, *e.g.*, *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015); *cf. Robinson v. Village of Oak Park*, 2013 IL App (1st) 121220, ¶ 36 (separately assessing religious-discrimination and reasonable-accommodation claims; stating that reasonable accommodation claim is established by first showing three-part *prima facie* case: (1) a religious practice/belief that conflicts with an employment requirement; (2) communication by the employee to the employer of the need to observe the religious practice/belief; and (3) adverse employment action because of the employee's religious practice/belief; further noting that, if employee establishes *prima facie* case, the burden shifts to employer to show either that reasonable accommodation was offered or that any accommodation would result in undue hardship).[11]

¶ 70    Generally, employment discrimination claims assert either disparate treatment or disparate impact. *Peyton v. Department of Human Rights*, 298 Ill. App. 3d 1100, 1108 (1998). A disparate-treatment claim, which plaintiff seeks to allege in count II, requires a showing "that the employer simply treated some people less favorably than others because of their race, color, religion, sex, or national origin." (Internal quotation marks omitted.) *Id.* Under a disparate-impact theory, which was not alleged by plaintiff here, there must be a showing of "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." (Internal quotation marks omitted.) *Id.* Proof of discriminatory motive is required under a disparate-treatment theory but not a disparate-impact theory. *Id.*

¶ 71    However, a question exists concerning how reasonable-accommodation claims should be treated. There is ADA case law that holds that a "plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim" (*McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004)), because a reasonable-accommodation claim asserts solely that an employer has failed to reasonably accommodate

---

[11]*Robinson* cites a Seventh Circuit case using the *McDonnell Douglas* framework for a reasonable-accommodation claim. *Robinson*, 2013 IL App (1st) 121220, ¶ 36 (citing *Equal Employment Opportunity Comm'n v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997)).

the employee's disability, not that the employer treated the employee differently and less favorably than other, nondisabled employees (*Bultemeyer*, 100 F.3d at 1283 ("He is not comparing his treatment to that of any other *** employee. His complaint relates solely to [the defendant's] failure to reasonably accommodate his disability.")). The *McGary* court noted that "the crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced" and that the reasonable-accommodation requirement's purpose "is to guard against the façade of 'equal treatment' when particular accommodations are necessary to level the playing field." *McGary*, 386 F.3d at 1267; see also *Riel v. Electronic Data Systems Corp.*, 99 F.3d 678, 681 (5th Cir. 1996) ("By requiring reasonable accommodation, the ADA shifts away from similar treatment to different treatment of the disabled by accommodating their disabilities."). The logic behind these holdings is that the *McDonnell Douglas* burden-shifting framework is not appropriate, because it is used to prove *indirectly* that an employer discriminated against an employee, whereas a claim for failing to reasonably accommodate a disability alleges facts that, if proven, *directly* establish a violation of the ADA. *Bultemeyer*, 100 F.3d at 1283. "There is no need for indirect proof or burden shifting," because the employee is not alleging that he or she was treated differently and less favorably than nondisabled employees. *Id.*

¶ 72    Illinois case law has not directly addressed this issue and reflects some confusion as to how to treat such claims. Some cases fit the accommodation issue within the *prima facie* case. See, *e.g.*, *Department of Corrections*, 298 Ill. App. 3d at 541-43 (characterizing the reasonable accommodation regulations as "augment[ing]" the *prima facie* requirements and analyzing accommodation issue in the context of a *prima facie* disability discrimination case); *Whipple v. Department of Rehabilitation Services*, 269 Ill. App. 3d 554, 557-58 (1995) (determining that prior case law did not address how reasonable-accommodation issue fits within framework and concluding that "we would expand the second prong of the" *prima facie* test to incorporate reasonable-accommodation analysis), *abrogated on other grounds by Webb v. Lustig*, 298 Ill. App. 3d 695 (1998); *Milan v. Human Rights Comm'n*, 169 Ill. App. 3d 979, 984 (1988) (holding that *prima facie* case of disability discrimination includes reasonable-accommodation issue, without specifying how it factors into analysis). Other case law recites the *McDonnell Douglas* framework, but reflects an uncertainty as to how the reasonable-accommodation analysis fits within it and/or separately addresses the issue without comment. See, *e.g.*, *Owens v. Department of Human Rights*, 356 Ill. App. 3d 46, 53 (2005) (after finding that claimant was discharged for a nondiscriminatory reason, turning to reasonable-accommodation issue and characterizing it as "a more fundamental issue that we are required to address"); *Truger*, 293 Ill. App. 3d at 860-61 (reciting framework, concluding that second and third *prima facie* requirements were not met and then separately addressing several additional issues, including reasonable-accommodation argument, without explaining its import to *prima facie* case or the framework in general); *Illinois Bell Telephone*, 190 Ill. App. 3d at 1050 (after affirming administrative finding that the plaintiff was terminated because of her disability, turning next to separately assess reasonable-accommodation issue).

¶ 73    We find the ADA cases persuasive and hold that a reasonable-accommodation claim constitutes a separate type of disability discrimination claim that is distinct from disparate-treatment and disparate-impact claims. In count I (refusal to accommodate), plaintiff argued that the City failed to consider her accommodation request and denied it without making an individualized assessment. In count II, she alleged disparate treatment,

asserting that she was terminated because of her disability. As plaintiff notes, a fact finder could, on the one hand, find that, although the City did not violate its duty to accommodate plaintiff, it nonetheless terminated her employment because of an unlawful motive related to her disability; or, on the other hand, it could find that the City violated its duty to accommodate but did not terminate plaintiff's employment because of an unlawful motive. Thus, the claims are distinct, they involve different facts and considerations, and they are established by different approaches. *Bultemeyer*, 100 F.3d at 1283 (no need for indirect proof or burden shifting to establish failure to reasonably accommodate; alleged facts, if proven, would directly establish violation of ADA).

¶ 74    The cases upon which the City relies do not persuade us to hold otherwise. See *Harton v. City of Chicago Department of Public Works*, 301 Ill. App. 3d 378, 390-92 (1998) (rejecting argument that an employer commits a *per se* civil rights violation when it fails to investigate possibility of accommodation, even if applicant could not have performed job even with accommodation; commenting that court did "not wish to be interpreted as suggesting that employers should neglect to explore *** reasonable accommodation," because the failure "to do so might well expose an employer to liability under the [Human Rights] Act if it is subsequently determined that a reasonable accommodation would have enabled the applicant to perform the job despite her disability"); *Truger*, 293 Ill. App. 3d at 861 (noting duty to accommodate disability, but holding that the plaintiff's claim failed because she offered no evidence that she asked for a reasonable accommodation or that any type of accommodation would enable her to perform her job); *Whipple*, 269 Ill. App. 3d at 559 (applying regulations to hold, in part, that employer rebutted discrimination charge by showing that the employee was unqualified even with accommodation, *i.e.*, third prong of *prima facie* case not met). These cases do not address the issue before us.

¶ 75    We also reject the City's argument that a reasonable-accommodation claim may not be brought as a separate claim because this would result in double or even triple (as the City alleges here) recovery for the same alleged discriminatory acts. See *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 320-22 (1989) ("The law in Illinois is that a plaintiff shall have only one recovery for an injury [citation]; double recovery is a result which has been condemned [citation]."); see also *Kim v. Alvey, Inc.*, 322 Ill. App. 3d 657, 672 (2001) (double recovery is against public policy). The City claims that the only injury asserted here is plaintiff's termination and that she can recover only once for this alleged injury if she proves that the City violated the Act. We cannot question the policy against multiple recovery and we agree, for example, that a successful plaintiff cannot recover two back-pay awards for the same period. However, even if a plaintiff alleges the same injury in multiple counts, which plaintiff here did not necessarily do,[12] the policy against multiple recoveries does not preclude a plaintiff from asserting alternative theories of recovery in separate counts of a complaint. See *Robinson*, 2013 IL App (1st) 121220, ¶¶ 23-35 (the plaintiff brought separate claims, one alleging religious discrimination and one alleging failure to accommodate her

---

[12]In count I (refusal to accommodate), plaintiff alleged unspecified damages as a result of the City's refusal to accommodate; in count II (disparate treatment), she alleged termination of employment; and, in count IV (hostile work environment), she alleged interference with her work performance and aggravation of her medical conditions.

- 21 -

religious beliefs; the reviewing court *separately* analyzed the claims because, although the "two claims are factually related, they are analytically distinct").

¶ 76    Finally, the City asks us to hold as a matter of law that plaintiff's request for appropriate action to stop the harassment was not a request for a reasonable accommodation cognizable under the statute. For two reasons, we decline to address this question. It was not certified by the trial court, and, contrary to the City's assertion, it involves factual considerations that are inappropriate in a Rule 308 appeal.

¶ 77    In summary as to the first certified question, we hold that: (1) section 2-102(A) prohibits hostile-work-environment disability harassment and (2) reasonable-accommodation claims may be brought as separate claims under that section. We do not address whether plaintiff sufficiently pleaded any of her claims.

¶ 78                                    E. Second Certified Question

¶ 79    The second certified question[13] asks:

> "If section 2-102(A) permits a cause of action for disability harassment, does the provision in section 2-102(D) 'that an employer shall be held responsible for sexual harassment of the employer's employees by nonemployees or nonmanagerial and nonsupervisory employees only if the employer becomes aware of the conduct and fails to take reasonable corrective measures' (775 ILCS 5/2-102(D) (West 2014)) similarly apply to a cause of action for disability harassment brought under section 2-102(A)? If yes, does the employee or the employer bear the burden of alleging and proving that the employer: (a) is aware of the conduct by its nonmanagerial and nonsupervisory employees; and (b) fails to take reasonable corrective measures? If no, can the employer assert the *Faragher-Ellerth* affirmative defense to a hostile-work-environment harassment claim brought under section 2-102(A)?"

¶ 80                 (1) Does Section 2-102(D) Apply to Disability Harassment Claims?

¶ 81    In the first part of the second certified question, the issue is whether the parameters in section 2-102(D) apply to disability harassment claims brought under section 2-102(A). For the following reasons, we hold that those parameters apply to such claims.

¶ 82    Again, the statute's plain language is the most reliable indicator of legislative intent. *DeLuna*, 223 Ill. 2d at 59. We resort to statutory-construction aids only when the statute is ambiguous. *Id.* We also place substantial weight on and accord deference to the Commission's interpretation of the statute. See *Wanless*, 296 Ill. App. 3d at 403.

¶ 83    In proscribing *sexual* harassment, section 2-102(D) of the Human Rights Act states that it is a civil rights violation "[f]or any employer, employee, agent of any employer, employment agency or labor organization to engage in sexual harassment; provided, that an employer shall be responsible for sexual harassment of the employer's employees by nonemployees or nonmanagerial and nonsupervisory employees *only if the employer becomes aware of the conduct and fails to take reasonable corrective measures*." (Emphasis added.) 775 ILCS 5/2-102(D) (West 2014). Thus, in the context of claims of *sexual* harassment, the Human Rights Act provides that, where the offending employee is nonmanagerial and

---

[13]The Department does not offer an argument with respect to this question.

nonsupervisory, such as here, the employer is liable for the sexual harassment *only if it: (1) was aware of the conduct and (2) failed to take corrective measures*. *Id.* However, if the offending employee is supervisory, regardless of whether he or she has authority to affect the terms and conditions of the complainant's employment, the employer is strictly liable for the sexual harassment, regardless of whether the employer knew of the conduct. *Sangamon County*, 233 Ill. 2d at 137-39.

¶ 84 Further, although the parties do not address it, we note that, by rule, the Commission and Department have proscribed national origin harassment, including hostile-work-environment harassment. 56 Ill. Adm. Code 5220.900 (1986). In the regulations, they have adopted a standard of employer liability for coworker harassment nearly identical to that for sexual harassment. Compare 56 Ill. Adm. Code 5220.900(d) (1986) ("[w]ith respect to conduct between fellow employees, an employer is responsible for acts of harassment, in the workplace on the basis of national origin, where the employer, its agents or supervisory employees, [(1)] becomes aware of the conduct, and [(2)] fails to take immediate and appropriate corrective action") with 775 ILCS 5/2-102(D) (West 2014) (employer is liable for coworker sexual harassment only if it: (1) was aware of the conduct and (2) failed to take corrective measures). They have also done the same with respect to supervisory harassment. Compare 56 Ill. Adm. Code 5220.900(c) (1986) (employer is liable "regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence") with 775 ILCS 5/2-102(D) (West 2014) (strict liability regardless of whether the employer knew of the conduct and regardless of whether the offending employee has authority to affect the terms and conditions of the complainant's employment).

¶ 85 The standard for coworker harassment under federal law is similar. Title VII does not require or expect employers "to be aware of every impropriety committed by every low-level employee." *Hall v. Bodine Electric Co.*, 276 F.3d 345, 356 (7th Cir. 2002). Rather, under federal law, when the harassing employee is a coworker, the employer is liable under Title VII "only if it was negligent in controlling working conditions." *Vance v. Ball State University*, 570 U.S. ___, ___, 133 S. Ct. 2434, 2439 (2013). The employer was negligent "if the employer knew or reasonably should have known about the harassment but failed to take remedial action." *Id.* at ___, 133 S. Ct. at 2440-41; *Faragher*, 524 U.S. at 789. In the case of supervisory harassment, the federal standard differs somewhat from that under the Human Rights Act. If the harassing employee was a supervisor and the harassment resulted in tangible employment action, the employer is strictly liable. *Vance*, 570 U.S. at ___, 133 S. Ct. at 2439; *Faragher*, 524 U.S. at 807; *Burlington Industries, Inc.*, 524 U.S. at 765. If the harassing employee was a supervisor, but the harassment did not result in tangible employment action, the employer may raise the *Faragher-Ellerth* affirmative defense that: (1) it exercised reasonable care to prevent and correct the harassment and (2) the employee unreasonably failed to take advantage of the preventive or corrective opportunities the employer provided. *Vance*, 570 U.S. at ___, 133 S. Ct. at 2439; *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Under federal law, a "supervisor" for purposes of vicarious liability under Title VII is an employee who "is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at ___, 133 S. Ct. at 2439. The *Faragher* and *Ellerth* cases involved hostile-work-environment sexual harassment claims.

*Id.* at ___ n.3, 133 S. Ct. at 2442 n.3. Several federal courts of appeals have applied the *Faragher-Ellerth* affirmative defense to other types of hostile-work-environment claims. *Id.*

¶ 86     Turning to the case before us, the City's position is that section 2-102(D)'s parameters for employer liability should apply to disability harassment claims and that plaintiff must show her affirmative compliance with the City's reporting and corrective policies as a precondition to establishing the City's liability. Plaintiff's position is that section 2-102(D)'s parameters do not apply and that compliance with any City policies is not a precondition, but should be assessed only within the *McDonnell Douglas* framework.

¶ 87     The City notes that section 2-102(D) provides that, in the case of nonsupervisory harassment, an employer is liable only if it: (1) was aware of the conduct and (2) failed to take reasonable corrective measures. The City does not disagree that claims under the Human Rights Act should be analyzed under the *McDonnell Douglas* burden-shifting framework, but it urges this court to construe the statute to require an employee like plaintiff to show *affirmative compliance* with her employer's reasonable reporting and corrective policies as a *necessary precondition* to establishing liability under the statute. In the City's view, such a bright-line rule is consistent with the Human Rights Act and the General Assembly's purpose in protecting employers from unfounded charges, preventing harassment, promoting conciliation rather than litigation, and ensuring that victims do not profit from their failure to mitigate avoidable consequences.

¶ 88     As support for this position, the City points to the legislative history of section 2-102(D). During the House proceedings, Representative Currie stated, in response to a question about employer liability for nonsupervisory sexual harassment:

> "If the issue is two co-workers, I think the Bill *** will *** make clear that if the company has a policy, a practice, a review process for dealing with complaints of sex harassment, that review policy would have to be instituted before it would be appropriate for the complaint to come before the Commission." 83d Ill. Gen. Assem., House Proceedings, Mar. 23, 1983, at 57-58 (statements of Representative Currie).

¶ 89     Plaintiff first argues that section 2-102(D)'s parameters should not apply to disability harassment claims under section 2-102(A), because a contrary reading violates statutory-construction rules. Plaintiff suggests that, instead of section 2-102(D)'s provisions, the *McDonnell Douglas* burden-shifting framework adequately governs the parties' respective burdens of proof as to a hostile-work-environment disability claim under section 2-102(A). Specifically, once plaintiff sets forth her *prima facie* case of discrimination based on a hostile work environment, it then becomes the City's burden to articulate a legitimate, nondiscriminatory reason for its actions. Plaintiff suggests that the City could set forth that it had no notice of the harassment or that it took reasonable corrective measures to prevent it. Then, plaintiff notes, she could rebut the City's allegations by showing that its assertion is pretext, such as by showing that the City was aware of the hostile work environment or that plaintiff reported the harassment. Plaintiff urges, however, that this court *not* find that the failure to use an employer's policies is an *absolute bar* to a hostile-work-environment claim. Instead, she suggests that a plaintiff can contest that assertion under the *McDonnell Douglas* framework, under which a plaintiff always maintains the ultimate burden of proof (*e.g.*, to show that, in a case of coworker harassment, the employer was negligent).

¶ 90     Having held above that section 2-102(A) proscribes disability harassment, we conclude that the statute is ambiguous as to whether section 2-102(D)'s parameters for employer

liability for sexual harassment also apply to disability harassment. Thus, we turn to statutory-construction aids.

¶ 91     Assessing the Commission's interpretation and mindful of the policy underlying the statute, we hold that section 2-102(D)'s parameters apply to claims brought under section 2-102(A) for disability harassment. Our reading is consistent with the Commission's interpretation of the statute, under which the Commission promulgated nearly identical parameters for employer liability for national origin harassment. 56 Ill. Adm. Code 5220.900 (1986). Applying section 2-102(D)'s parameters to disability harassment claims will result in consistent treatment of all types of harassment claims under the Human Rights Act, and consistency promotes the policy to secure for all persons freedom from discrimination.

¶ 92     The City urges that we further hold that an employee's failure to use an employer's formal antiharassment policy *absolutely bars* his or her harassment claim. The legislative history the City noted above reflects that using an employer's antiharassment reporting mechanism or policy was contemplated by the General Assembly as a means to finding employer liability. It is unclear to us if it goes as far as the City's reading, *i.e.*, that a failure to use a policy constitutes an absolute bar. Specifically it is unclear if the statute's requirement of employer awareness of harassment contemplates actual *and constructive* notice of the harassment. *Cf. Vance*, 570 U.S. at ___, 133 S. Ct. at 2439 (under Title VII, employer is negligent and thus liable for coworker harassment if it knew *or reasonably should have known of* the harassment and failed to take remedial action). In any event, the certified question asks us to answer only whether section 2-102(D)'s awareness and corrective-measure parameters apply to harassment cases under section 2-102(A). The City's argument addresses an issue beyond that certified for our review. Accordingly, we do not reach it.

¶ 93            (2) Burden of Proving Awareness and Failure to Take Corrective Measures

¶ 94     Given our holding as to the first part of the second certified question–that section 2-102(D)'s parameters apply to disability harassment claims brought under section 2-102(A)–we note that the second part of the second certified question asks: If yes, does the employee or the employer bear the burden of alleging and proving that the employer: (a) is aware of the conduct by its nonmanagerial and nonsupervisory employees and (b) fails to take reasonable corrective measures? It has been noted that, under the *McDonnell Douglas* framework, the ultimate burden of persuasion always rests with the plaintiff; only the burden of production shifts between the plaintiff and the employer. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 (1993); see also *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) (under Title VII, the plaintiff must establish employer's knowledge and lack of effectual corrective action). In our view, the statutory language does not suggest any departure from this general rule. Thus, we conclude that the plaintiff bears the burden of proving awareness and failure to take corrective measures.

¶ 95     In summary, as to the second certified question, we hold that the parameters for employer liability under section 2-102(D) of the Human Rights Act apply to disability harassment claims brought under section 2-102(A) and that the employee bears the burden of persuasion with respect to such claims.

¶ 96                                    F. Third Certified Question

¶ 97        The third certified question asks: Does the Tort Immunity Act apply to a civil action under the Human Rights Act where the plaintiff seeks damages, reasonable attorney fees, and costs? If yes, should this court modify, reject, or overrule its holdings, in *Birkett*, 325 Ill. App. 3d at 202, *Firestone*, 119 Ill. App. 3d at 689, and *Streeter*, 44 Ill. App. 3d at 394-95, that "the Tort Immunity Act applies only to tort actions and does not bar actions for constitutional violations" (*Birkett*, 325 Ill. App. 3d at 202)? The City argues that the Tort Immunity Act applies to plaintiff's Human Rights Act claims because they are not claims under the Illinois Constitution. Alternatively, the City contends that we should reject our previous holdings that the Tort Immunity Act applies only to tort actions and does not apply to actions for constitutional violations. For the following reasons, we conclude that the Tort Immunity Act applies to actions under the Human Rights Act. The City can assert immunity with respect to plaintiff's request for damages but not to her request for equitable relief. We acknowledge that the supreme court has impliedly rejected our holdings that the Tort Immunity Act applies only to tort actions and does not apply to constitutional claims. Accordingly, we do not follow that precedent.

¶ 98                                   (1) Statutory Frameworks
¶ 99                                   (i) Tort Immunity Act

¶ 100       The 1970 Illinois Constitution abolished the doctrine of sovereign immunity, except as the General Assembly may provide by statute. Ill. Const. 1970, art. XIII, § 4. Thus, the General Assembly is "the ultimate authority in determining whether local units of government are immune from liability." (Internal quotation marks omitted.) *Harris v. Thompson*, 2012 IL 112525, ¶ 16. The Tort Immunity Act's purpose "is to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1(a) (West 2014). By providing immunity, the General Assembly sought to prevent public funds from being diverted from their intended purpose to the payment of damages claims. *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001). The Tort Immunity Act does not create duties but, rather, merely codifies existing common-law duties, to which the delineated immunities apply. *Id.*

¶ 101       The Tort Immunity Act adopts the general principle that local governmental units are liable in tort and other civil actions, but it limits this liability with an extensive list of immunities based on specific government functions. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386 (1996). The statute is in derogation of the common law and, therefore, must be strictly construed against the public entities involved. *Aikens v. Morris*, 145 Ill. 2d 273, 278 (1991).

¶ 102       Section 2-101 of the Tort Immunity Act states that it does not affect the right to obtain relief, *other than damages*, against a local public entity or public employee. 745 ILCS 10/2-101 (West 2014). Further, the statute expressly states that it does *not* affect the liability of a local public entity or public employee based on: (1) contract; (2) operation as a common carrier; (3) the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2014)); (4) the Workers' Occupational Diseases Act (820 ILCS 310/1 *et seq.* (West 2014)); (5) section 1-4-7 of the Illinois Municipal Code (65 ILCS 5/1-4-7 (West 2014) (municipal liability for damage to property by the removal, destruction, or vacation of any unsafe or unsanitary building)); or

(6) the Illinois Uniform Conviction Information Act (20 ILCS 2635/1 *et seq.* (West 2014)). 745 ILCS 10/2-101(f) (West 2014).

¶ 103    Section 2-109 of the Tort Immunity Act provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2014). Section 2-201 states: "*Except as otherwise provided by Statute*, a public employee serving in a position involving the determination of policy or the exercise of discretion is *not* liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." (Emphases added.) 745 ILCS 10/2-201 (West 2014). Section 1-204, which defines the term "injury," states, in part, that the term "*includes any injury alleged in a civil action, whether based upon* the Constitution of the United States or *the Constitution of the State of Illinois*, and the statutes or common law of Illinois or of the United States."[14] (Emphases added.) 745 ILCS 10/1-204 (West 2014).

¶ 104    The supreme court has rejected the claim that the Tort Immunity Act "categorically excludes" nontort actions. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004) ("we do not adopt or approve of the appellate court's reasoning that the Tort Immunity Act categorically excludes actions that do not sound in tort"). But see *Birkett*, 325 Ill. App. 3d at 202 (Tort Immunity Act applies only to tort actions and not constitutional violations); *Firestone*, 119 Ill. App. 3d at 689 (Tort Immunity Act "applies only to tort actions [citations], and does not bar a civil rights action"; count alleged equal protection violations of federal and Illinois constitutions, as well as violation of section 1983); *Streeter*, 44 Ill. App. 3d at 395 (the plaintiffs sought damages for county's vacation of road that they alleged reduced the value of their property without compensation, and, separately, they sought compensation for the unconstitutional taking; court held that claim did not allege a tort but was "analogous to a claim for compensation in an eminent domain proceeding"; notice provisions of Tort Immunity Act did not bar the plaintiffs' suit).

¶ 105                                    (ii) Human Rights Act

¶ 106    The Human Rights Act defines "employer" to include: (1) the "State and any political subdivision, municipal corporation or other governmental unit or agency, without regard to the number of employees" (775 ILCS 5/2-101(B)(1)(c) (West 2014)); and (2) any "person" (defined to include "the State of Illinois and its instrumentalities, political subdivisions, [and] units of local government" (775 ILCS 5/1-103(L) (West 2014))) "employing one or more employees when a complainant alleges civil rights violation due to unlawful discrimination based upon his or her physical or mental disability unrelated to ability, pregnancy, or sexual harassment" (775 ILCS 5/2-101(B)(1)(b) (West 2014)). Further, in section 2-102(A), the Human Rights Act provides that it is unlawful for any "*employer* to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or

---

[14]However, the statute does not shield a defendant from a federal claim, such as a section 1983 claim (42 U.S.C. § 1983 (2012)), because the supremacy clause of the United States Constitution provides that federal laws are supreme to state laws. See *Thomas ex rel. Smith v. Cook County Sheriff*, 401 F. Supp. 2d 867, 875 (N.D. Ill. 2005); *Anderson v. Village of Forest Park*, 238 Ill. App. 3d 83, 92 (1992).

conditions of employment on the basis of unlawful discrimination or citizenship status." (Emphasis added.) 775 ILCS 5/2-102(A) (West 2014).

¶ 107                    (2) Tort Immunity Act Applies to Claims Under the Human Rights Act

¶ 108    The City argues that the Tort Immunity Act applies to plaintiff's Human Rights Act claims because they are not claims under the Illinois Constitution. Alternatively, it argues that, even if plaintiff's claims are constitutionally based, the Tort Immunity Act applies. The City contends that we should reject our previous holdings that the Tort Immunity Act applies only to tort actions and does not apply to actions for constitutional violations.

¶ 109    Again, in her four-count complaint, plaintiff alleged: (1) refusal to accommodate; (2) disparate treatment; (3) retaliation; and (4) hostile work environment. In each count, she sought back pay, front pay, the value of lost benefits, actual damages, "emotional and other compensatory damages," reinstatement with full seniority, attorney fees, and the costs of suit. All of those forms of relief are available under the Human Rights Act. 775 ILCS 5/8A-104 (West 2014) (among other forms of relief, the Commission may award: (1) actual damages; (2) hiring, reinstatement or upgrade, back pay, and fringe benefits; (3) restoration of labor organization membership; and (4) attorney fees and costs; further, it may (5) make the complainant whole, including by way of awarding interest); 775 ILCS 5/10-102(C) (West 2014) (circuit court may award: (1) actual and punitive damages; (2) injunctive relief; and (3) attorney fees and costs to a prevailing party other than the State).

¶ 110    The central issue here is whether the Tort Immunity Act applies to plaintiff's claims for damages (*i.e.*, her prayers for "actual damages" and "emotional and other compensatory damages"), not her ability to obtain equitable relief. The statute, as noted above, does not affect the right to obtain relief, *other than damages*, against a local public entity or public employee. 745 ILCS 10/2-101 (West 2014); see, *e.g.*, *In re Consolidated Objections to Tax Levies of School District No. 205*, 193 Ill. 2d 490, 500-02 (2000) (section 2-101 excludes injunctive remedies from the statute). Therefore, the City clearly cannot assert immunity with respect to plaintiff's request for back pay, front pay, lost benefits, or reinstatement. See, *e.g.*, *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir. 2001) (back pay, front pay, and reinstatement constitute equitable remedies under Title VII); see also *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000) ("[f]ront pay and back pay under Title VII and the ADA are 'equitable' matters, but they still are dollar values").

¶ 111    We first conclude that claims under the Human Rights Act are constitutionally grounded and/or derived. As relevant here, the Human Rights Act expressly implements the constitutional guarantee of freedom from disability discrimination in employment (Ill. Const. 1970, art. I, § 19). 775 ILCS 5/1-102(F) (West 2014). The civil rights protected by the Human Rights Act are constitutional rights, and, thus, plaintiff's claims are constitutionally grounded and/or derived; they are not tort actions. See *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 518 (1997) ("An action to redress a civil rights violation has a purpose distinct from a common law tort action," and each type of claim must be separately proved.); see also *Yount v. Hesston Corp.*, 124 Ill. App. 3d 943, 947-49 (1984) (the Illinois Constitution does not authorize a private right of action to enforce section 19 of article I; thus the plaintiff could not bring a private action under section 19 for employment discrimination based on disability; the Human Rights Act is the exclusive remedy that the plaintiff could have pursued); *cf. Melvin v. City of West Frankfort*, 93 Ill. App. 3d 425, 432 (1981) (holding first

that statute that barred disabled applicants from certain firefighter positions with municipalities was unconstitutional under section 19; further holding that Tort Immunity Act immunized city employees with respect to the applicant's claim for damages, because his pleadings raised *constitutional* challenge asserting denial of wages, which "follows the traditional model of a tort claim," not a contractual one, and thus was barred; constitutional provision did not create a contractual right).

¶ 112   Having determined that plaintiff's claims are constitutionally grounded, we next address whether the City may assert immunity as to plaintiff's claims for damages. We answer that question in the affirmative. As noted, the supreme court has rejected the claim that the Tort Immunity Act "categorically excludes" nontort actions. *Raintree Homes*, 209 Ill. 2d at 261 ("we do not adopt or approve of the appellate court's reasoning that the Tort Immunity Act categorically excludes actions that do not sound in tort"). However, as noted, there is case law in this district that holds that the Tort Immunity Act applies only to tort claims and does not apply to constitutional claims. See *Birkett*, 325 Ill. App. 3d at 202; *Firestone*, 119 Ill. App. 3d at 689; *Streeter*, 44 Ill. App. 3d at 395. *Raintree Homes*, in our view, has impliedly rejected our holdings, including, as relevant here, our holdings that constitutional claims and civil rights actions are not subject to the Tort Immunity Act.

¶ 113   Given *Raintree Home*'s pronouncement that the statute generally does not exclude nontort actions, we turn to the provision that answers the precise question before us. As the City notes, section 1-204 of the Tort Immunity Act, which defines the term "injury," states, in part, that the term "*includes any injury alleged in a civil action, whether based upon* the Constitution of the United States or *the Constitution of the State of Illinois*, and the statutes or common law of Illinois or of the United States." (Emphases added.) 745 ILCS 10/1-204 (West 2014); see also 745 ILCS 10/8-101(c) (West 2014) (one-year statute of limitations for a "civil action" under the Tort Immunity Act; "civil action" includes an action based upon the "Constitution of this State"). We agree with the City that the Tort Immunity Act clearly encompasses constitutional claims, including those brought under the Human Rights Act.[15]

¶ 114   In *Birkett*, we quoted this passage from section 1-204, but we rejected the plaintiff's argument that the Tort Immunity Act provided immunity for constitutional causes of action. *Birkett*, 325 Ill. App. 3d at 201-02. We did so without analyzing section 1-204 and apparently based our conclusion concerning constitutional claims on our holding that the statute applies only to tort actions, as the former necessarily flows from the latter. *Id.* at 202 (the statute "applies only to tort actions and does not bar actions for constitutional violations"). *Birkett* cited *Firestone* and *Streeter*, which merely adopted the same erroneous conclusion that the statute is limited to tort claims, and *Anderson v. Village of Forest Park*, 238 Ill. App. 3d 83, 92 (1992), which held that the statute did not apply to a *federal* (*i.e.*, section 1983) claim. Those cases are further problematic because they were decided before or overlooked the amendment of section 1-204's definition of injury to add claims brought under the "Constitution of the State of Illinois." See Pub. Act 84-1431, art. 1, § 2 (eff. Nov. 25, 1986) (amending Ill. Rev. Stat. 1985, ch. 85, ¶ 1-204); see also Stephanie M. Ailor, Note, *The Legislature Versus the Judiciary: Defining "Injury" Under the Tort Immunity Act*, 57 DePaul

---

[15]Of course, the Tort Immunity Act would also apply even if a Human Rights Act claim were not constitutional, but merely statutory, as it also applies to actions based upon "the statutes *** of Illinois." 745 ILCS 10/1-204 (West 2014).

L. Rev. 1021, 1051-52 (2008) (addressing the current discrepancy between the statute and outstanding case law and noting that the problem "arose from a failure to recognize the statutory amendment").

¶ 115 In summary, we hold that the Tort Immunity Act applies to actions under the Human Rights Act. The City can assert immunity with respect to plaintiff's requests for damages but not to her requests for equitable relief. We acknowledge that the supreme court has impliedly rejected our previous holdings that the Tort Immunity Act applies only to tort actions and does not apply to constitutional claims. Accordingly, we do not follow that precedent.

¶ 116                                    III. CONCLUSION

¶ 117 We have answered the certified questions, and we remand the cause to the trial court for further proceedings.

¶ 118 Certified questions answered; cause remanded.

¶ 119 JUSTICE McLAREN, concurring in part and dissenting in part.

¶ 120 Although I concur with some of what the majority has opined, I must also dissent from portions of the majority opinion.

¶ 121 First, I dissent from the majority's determination that the legislature has created the cause of action of "disability harassment." The majority correctly relates that the term "harassment" and the phrase "hostile or offensive working environment" explicitly appear in the Human Rights Act in the employment context only in connection with "sexual" harassment. *Supra* ¶ 29. The majority also correctly states that the Human Rights Act: "explicitly prohibits sexual harassment" (*supra* ¶ 29); "does not, with respect to employment, explicitly refer to disability *harassment*" (emphasis in original) (*supra* ¶ 34); and "explicitly makes only *sexual* harassment a civil rights violation" (emphasis in original) (*supra* ¶ 34). From these explicit observations, the majority then concludes that the Act is "ambiguous" and "does not explicitly state that sexual harassment is the only type of harassment claim that constitutes a civil rights violation." *Supra* ¶ 42.

¶ 122 I believe that the majority is not considering the legal maxim of statutory interpretation "*inclusio unius est exclusio alterius*," which provides that the inclusion of one thing implies the exclusion of another; in other words, "where a statute lists the thing or things to which it refers, the inference is that all omissions are exclusions, even in the absence of limiting language." *City of St. Charles v. Illinois Labor Relations Board*, 395 Ill. App. 3d 507, 509-10 (2009). The efficacy of this maxim is demonstrated by the logical gymnastics required by the majority's analysis: while the Human Rights Act "explicitly makes only *sexual* harassment a civil rights violation" (emphasis in original) (*supra* ¶ 34), the Act "does not explicitly state that sexual harassment is the only type of harassment claim that constitutes a civil rights violation" (*supra* ¶ 42). Simply put, if the legislature wanted to enlarge the reach of the statute to include *any or all* types of harassment beyond sexual harassment, it easily could have done so. It did not.

¶ 123 Additionally, if section 2-102(D) was added as a clarification (see *supra* ¶ 48), it is puzzling why the clarification was made to "*narrowly expand* the available protections" (emphasis in original) (*supra* ¶ 48) and was not all-inclusive, adding hostile-work-

- 30 -

environment harassment as a civil rights violation in regard to all of the enumerated protections. In any event, the fact that this question was certified to this court suggests that the legislative "clarification" is far from clear.

¶ 124    I submit that the answer to the first part of the first certified question should be that there is no statutory cause of action for disability harassment. (However, the complaint stated a cause of action for disability discrimination.) I would thus answer the question with a qualified negative.

¶ 125    I further dissent, for two reasons, from the majority's answer to the third certified question. First, I do not believe that the question is a proper question; second, I believe that the majority's answer is incorrect.

¶ 126    I do not believe that there are reasonable grounds for a difference of opinion as to whether the Tort Immunity Act applies to a Human Rights Act claim. The form of the question implies that we would be effectively overruling three prior decisions of this court. The only reason for us to depart from this line of cases (stretching back almost 40 years) would be the supreme court's overruling of those cases. This has not occurred. Therefore, there is no difference of opinion, and the question is not a proper question to be answered under Rule 308.

¶ 127    The majority references a quote from *Raintree Homes* and claims that, by this, the supreme court impliedly rejected our previous holdings. I disagree. The majority states, "The supreme court has rejected the claim that the Tort Immunity Act 'categorically excludes' nontort actions. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004) ('we do not adopt or approve of the appellate court's reasoning that the Tort Immunity Act categorically excludes actions that do not sound in tort')." *Supra* ¶ 104. The supreme court declined to "adopt or approve" our reasoning; however, the court did not reject our reasoning, nor did it overrule our holdings. It merely affirmed on a different basis. *Raintree Homes*, 209 Ill. 2d at 261. I interpret the supreme court's statement as a general proposition that did not overrule the previously cited decisions but merely established an outer limit of the Tort Immunity Act. Additionally, the facts in *Raintree Homes* are not the same, or even substantially the same, as the facts herein; thus, *Raintree Homes* is not controlling. See *Blount v. Stroud*, 232 Ill. 2d 302, 324 (2009) ("the precedential scope of our decision is limited to the facts that were before us"); see also *People v. Trimarco*, 364 Ill. App. 3d 549, 555 (2006) (McLaren, J., dissenting).

¶ 128    The supreme court in *Raintree Homes* also said that "logic" similar to that employed by the majority here was not controlling as well:

> "While the Village correctly asserts that *Village of Bloomingdale* may have implicitly found that the Act applied to some nontort actions specifically at issue in that case, such a holding does not imply that the Act applies to *all* nontort actions against a government, including impact fee refund actions." (Emphasis in original.) *Raintree Homes*, 209 Ill. 2d at 259.

In my opinion, *Raintree Homes* did not address the precedent that the majority here is willing to reject. Even if it did, the court did not reject it with such a broad generalization. I submit that the supreme court might say the same thing quoted above about the majority's implication that, per the *Raintree Homes* generalization, the Tort Immunity Act categorically applies to actions that do not sound in tort.

¶ 129    The second reason for my dissent from the majority's answer to the third certified question is that I believe that the specific inclusion of municipal corporations in the Human Rights Act meant that the legislature intended that public employees be given the same rights as employees in the private sector. The City claims that these are not rights that are set forth in the constitution. I submit that the Human Rights Act was intended to prescribe the forms of relief for what are constitutional rights and not some brooding omnipresence in the sky. Apparently, the majority agrees:

> "We first conclude that claims under the Human Rights Act are constitutionally grounded and/or derived. As relevant here, the Human Rights Act expressly implements the constitutional guarantee of freedom from disability discrimination in employment (Ill. Const. 1970, art. I, § 19). 775 ILCS 5/1-102(F) (West 2014). The civil rights protected by the Human Rights Act are constitutional rights, and, thus, plaintiff's claims are constitutionally grounded and/or derived; they are not tort actions. See *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 518 (1997) ('An action to redress a civil rights violation has a purpose distinct from a common law tort action' ***." *Supra* ¶ 111.

I bolster my opinion with the submission that violating the Human Rights Act does not comport with any formulation of reasonable policy or exercise of discretion that the Tort Immunity Act is supposed to protect. The majority concludes that the Tort Immunity Act's definition of injury is the basis for its application to this cause of action. See *supra* ¶ 114. This is incorrect. I submit that the relationship between plaintiff and defendant here is that of employee and employer. I also submit that plaintiff's employment contract implicitly included the Human Rights Act. Plaintiff's right to be free from unlawful discrimination in the "terms, privileges or conditions of employment" (775 ILCS 5/2-102(A) (West 2014)) is based on the fact that she is employed. As such, any injury in this case arose from a breach of contract, not from a tort. The Tort Immunity Act explicitly states that it does not affect the liability of a local public entity or public employee based on contract. See 745 ILCS 10/2-101(a) (West 2014); see also *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 500 (2001). Thus, the Tort Immunity Act does not apply to this contract-based cause of action.